# The Commonwealth ex rel. Leech *against* The Canal Commissioners.

The canal commissioners have power so to regulate the tolls and discriminate between the different modes of transporting goods and passengers as will best promote the interest of the State.

*MANDAMUS.* This case originated upon the petition of David Leech, James M. Davis, James Steel & Co., and E. G. Dutilh & Co., who complained that the respondents, John B. Butler, Levi Reynolds, and William Overfield, in December 1842, entered into a contract with Cameron and Wilson, by which there was secured

[Commonwealth v. The Canal Commissioners.]

to them the exclusive privilege of carrying passengers on the Philadelphia and Columbia Railroad, in passenger cars, which, it was alleged, they were unauthorized and it was in violation of law to do. The relators also complained that the respondents, in pursuance of the Act of the 1st July 1842, had procured a number of trucks, and made certain regulations, allowing the same to be used on the Philadelphia and Columbia and Allegheny Portage Railroads, without any charge for motive-power; while others carrying merchandise in their own cars, or using their own trucks, were obliged to pay the State for motive-power: by all which, it was alleged, a few would soon obtain a monopoly of the carrying trade.

The respondents answered, that it was true they had entered into a contract with Cameron and Wilson for carrying passengers on the Philadelphia and Columbia Railroad, and that they exercised the right to do so by authority conferred on them by the Acts of the 8th and 15th April 1834. They also admitted the allegations of the relators, that they had purchased trucks for the Commonwealth, and had made certain regulations respecting the charges for the use of them, but denied that they made no charge for motive-power. But on the contrary, while they charged those who used their own cars, toll and motive-power for tonnage and toll and motive-power for wheels; as to section-boats carried upon the State trucks, their owners were charged the same toll and motive-power for tonnage, and a gross sum of thirty-seven and a half cents per thousand pounds for the use of the trucks, which they alleged was but another name for motive-power toll on wheels, and that the charges thus made upon one class of carriers and the other, were as nearly equal as their experience would enable the respondents to estimate. But the respondents also claimed to have the authority under the existing laws of the State to adopt such regulations, and impose such tolls and charges, as, in their judgment, would best promote the public interests. They then further answered, that the system they had adopted, and the regulations they had made, had greatly promoted the public interest, by introducing a fair competition, which had reduced the price of transportation, increased the public revenue, and restored the public works to the State authorities from the hands of the relators, who had heretofore been enabled to monopolize the whole carrying business and the price of transportation.

Upon this return, the relators asked the court to award a peremptory *mandamus.*

*Watts,* for the respondents, on a previous day had moved to quash the writ, on the ground, that "the petition upon which the writ issued is by several individuals and companies, who cannot legally join in suing out a writ of *mandamus:*" and on that point argued, that a *mandamus* was a remedy in all cases for an injured

[Commonwealth . v. The Canal Commissioners.]

party, who had a right to have anything done and had no other specific means of compelling its performance. 1 *Wend.* 324; 6 *Mod.* 310; 12 *Johns.* 414. Here the petitioners, who are carriers upon the public works, complain that the regulations which they seek to have abrogated, have given undue advantages to certain other individuals in the same business, by which they are injured. Although this may be a grievance to them individually, they cannot join in any remedy whatever: for it is clearly settled that two or more persons cannot join in suing out a *mandamus;* for a wrong done to one is no wrong to the other. 12 *Mod.* 332; 1 *Stra.* 578; 2 *Salk.* 433; 5 *Mod.* 11. If there were a false return, the petitioners could not join in an action therefor. 12 *Mod.* 349. By the Act of the 14th June 1836, sect. 21, the remedy by writ of *mandamus* is modified and regulated so that it may be used to recover damages by the injured party: if the facts set out in the petition be denied, the case is sent to a jury, who not only determine the rights of the parties, but redress the injury by the assessment of damages, which may be recovered by execution as in other cases. Now, if this case should so result, to whom would the damages be awarded, and in what proportions would the relators be entitled to them? If an alternative *mandamus* be defective in form or substance, the respondent's remedy is to move to quash it. 10 *Wend.* 25.

*Meredith* and *Stevens,* for the relators, on the motion to quash argued, that a public wrong had been done, of which the petitioners complained, not that an injury had been inflicted upon them particularly, or that they were entitled to recover damages for any wrong done, but that the law had been violated by the adoption of certain resolutions by the respondents in relation to the use of the public works, in consequence of which, the public had been injured. The respondents have by law the control of the public works for the public use, and if they be guilty of any act of omission or misfeasance, by which the design of the law is defeated, the writ of *mandamus* is the proper and only remedy. 3 *Burrow* 1265; 11 *Mod.* 206; 6 *Term Rep.* 198; 1 *Salk.* 374; 4 *Burrow* 2452; *Jacob's Law Dic. Title " Mandamus."*

On the merits, the counsel referred to the resolution of the Legislature of the 11th June 1832, (*Pamph. Laws* 648); 1st sect. of Act 15th April 1834, page 508; 21st February 1834, 569; 1st sect. Act 1st July 1842, 309; 1st sect. of Act 1834, 200; 3d sect. of Act 25th February 1826; and contended, that the canals and railways of the State were public high-ways, upon which all persons had a right to travel upon the same terms, and that all rules and regulations which gave any peculiar privileges to one over another, was a violation of law, because it was a perversion of the design of the Legislature in establishing the public works for the public benefit. It is clear, and the fact is not denied, that by

the contract with Cameron and Wilson, there is given to them the, exclusive right to carry passengers. upon the Columbia Railroad; and it is equally clear, that those who carry their goods upon trucks, are charged a different and less amount of tolls than those who carry upon cars.   The necessary result of which is, that a monopoly of the carrying business is given to certain individuals who carry in a particular way : and it is contended, that the reso- lutions and regulations of canal commissioners which establish and grant this monopoly, are void at common law.   4 *Bac. Ab.*, *title* "*Monopoly*," *A.* 765 ; 3 *Inst.* 181.   If the respondents have the right to adopt a rate of tolls, or any regulation by which indivi- duals are charged differently, the necessary consequence is, that they have the right to say who shall, and who shall not travel or do business upon the public works.   This they have virtually done by the resolutions complained of, and the writ of *mandamus* is the proper and only remedy.   3 *Bl. Com.* 110 ;, 2 *Mod.* 335.; 4 *Mod.* 233 ;, 2 *Barn. & Ald.* 646.

*Watts*, in reply, argued, that owing to the peculiar character of the public works, being composed of alternate links of railway and canal, the Legislature have never undertaken to adopt any rules or regulations for their use, for the very plain reason, that any general law on the subject would be wholly ineffectual to guard against the frauds which would be continually practised upon the State.   They require the constant watchfulness of the public officers, and their peculiar regulations.   Hence, the power is expressly given to the canal commissioners to charge such tolls, and adopt such rules and regulations. relative to the use of the canals and railways of the State as necessity shall require.   Acts 24th March 1828, sect. 15; 11th June 1832; 8th April 1834, sect. 6; 15th April 1834, sect. 1; 21st February 1834, sect. 1; 16th April 1838, sect. 12; 1st July 1842, sects. 1, 2.   This power never can, and never ought to be otherwise disposed of.   It is a sufficient answer to the complaint of the effect of the charges made for carrying goods upon trucks, that it is wholly impossible to have a perfect equalization of tolls, inasmuch as the State owns the trucks and it does not own the cars.   All the respondents can say is, that they have made them as nearly equal as the circumstances of the case will admit.   But, the inequality of charge is not the real cause of complaint; but it is, that the monopoly. so exceedingly injurious to the public interests, which the relators have enjoyed for years, is likely to be broken in upon, and a new set of carriers introduced upon the public works, that their usefulness and profit may be enlarged.   Before the establishment of the truck system, and the regulations consequent upon it, so great was the amount of capital required to become a carrier upon the public works, that few could engage in it—and those few could combine together to control the whole subject; and this proceeding is but one evidence of that

combination, and not the only one which these relators have made to keep this important interest of the State in their own hands. Now, he who can command the price of a boat and a horse, can come in competition with any amount of capital, and this is what the relators please to call the establishment of a monopoly! So with regard to the carrying of passengers, when the power to regulate the price was in the hands of the carrier, the business was driven from the works; and now that the commissioners have undertaken to control the price and reduce it, they are complained of. To all this it is sufficient to answer, that the Legislature have foreseen the evils, which would result from placing the control of this subject elsewhere than in the hands of their own officers. They have exercised that power, and nothing can be more clearly settled that, wherever there is a discretionary power vested in officers, and they have exercised that discretion, the court will not interfere to grant a *mandamus,* because they cannot control, and ought not to coerce that discretion. 12 *Johns.* 414; 3 *Binn.* 273; 5 *Binn.* 87; 6 *Binn.* 456; 5 *Binn.* 536; 1 *Yeates* 46.

The opinion of the Court was delivered by

GIBSON, C. J.—The conclusion at which we have arrived in respect to the merits of the complaint, makes it unnecessary to act on the motion to quash the writ.

The Commonwealth's lines of canals and railroads are not highways, which the citizen is entitled to use of common right; or what would in England be called, in technical language, the King's highways, which are free and common passages for his people. Like the crown there, the Commonwealth here, as *parens patriœ,* or general trustee of popular franchises, has highways which are free to all the citizens; but such are not her railways and canals. Being made at her particular cost, they are, so to speak, her private property; and they are consequently subject to her exclusive use, or the use of those to whom she farms them for her emolument. But she does not permit individuals to use them as she permits them to use her highways, properly so called, which are common to all. The citizen has a personal interest in the public works, it is true; not however immediately as a proprietor, but remotely as a member of the community. These railways and canals are held by the State as others are held by incorporated companies whose members have no greater right to use them than have their fellow-citizens who are not corporators; and the public lines partake even less of the character of highways, inasmuch as the State might suspend the use of them or close the business on them entirely by virtue of its sovereign power; which might not be done by a corporation whose charter is granted on an implied condition that the public accommodation afforded by it be not discontinued. This principle of the State's absolute ownership of the property, and consequent power to control the use of it for the

[Commonwealth v. The Canal Commissioners.]

public benefit, without regard to the private interests of individuals, is of such importance to the question before us, that it may be said to lie at the very root of it.   It has not been urged, however, that the State would not be competent to make the regulations in question by the instrumentality of the Legislature or agents duly authorized, and the question is whether the respondents were so.

Specific powers have been given to the canal commissioners by sundry enactments; but the general power which is thought to authorize the regulation in question, is found particularly in three of them.   By the Act of the 15th April 1834, they were empowered to put locomotive engines on the Commonwealth's railroads under such regulations as they should deem necessary to be prescribed, and the citizens were authorized to attach cars to them : and by a joint resolution passed the 21st of February, in the same year, these officers were required to permit cars to be put on the finished part of the Portage Railroad, " and also to adopt rules and regulations for the use of the said road."   But their general and permanent authority is contained in the 12th section of the Act of 16th April 1838, which is, in substance, a repetition of the 6th section of the Act of 8th April 1834, and which declares, " that the board of canal commissioners shall have power to make such rules and regulations *not inconsistent with the laws of this Commonwealth*, as to the form and structure of the locomotive engines and vehicles used on the State railroads, for weighing and inspecting such engines and other vehicles and their lading; for collecting tolls; *and in* ALL '*matters connected with the* USE *and preservation of the railroads ;* and impose such fines for breach of such rules and regulations, as they may deem reasonable."   We perceive in this, no other limitation of the power to make rules and regulations connected with the use of the railroads, than that they be not inconsistent with the laws of the Commonwealth.   Words could scarce be found to carry a grant of larger powers; and, indeed, as the commissioners were not to have the Legislature perpetually at hand to provide for emergencies, nothing less than plenary powers would have enabled them to execute their office to the greatest public advantage.   The question, then, comes to this : In what respect are these regulations, connected as they are with the use of the railroads, inconsistent with the laws of the Commonwealth?

They give certain individuals a preference, say the relators, which is virtually a monopoly ; and all their argument is comprised in that one word — an unexpected one from them.   But granting the fact of preference, for the sake of the argument, in what respect are monopolies inconsistent with the laws of Pennsylvania ?   We have no general statute which prohibits them; but certain monopolies granted by the British crown, were held to be illegal and void at the common law; such, for instance, as an exclusive right to import, buy, sell, make, work, or use, any particular article or thing.   We are told that the abuses of such grants,

v. — 50

in the reign of Elizabeth, led to the more effectual suppression of them by the 21 *Jac.* 1, c. 3, which, however, has never been in force in this State. That statute, which was declarative of the fundamental laws of the realm, imposed a more effectual restriction on the power of the crown to create monopolies, *proprio vigore*, than had previously been provided; but an attempt to create them by the concurrent action of the parliament and the crown, would equally have been a violation of the constitution, and one which would speedily have been redressed by the nation. But we have no constitutional prohibition on the subject; and though the common law principle might be opposed to these regulations, if they were found to conflict with it, yet it is not every preference or monopoly that is illegal. On the contrary, we have a countless number of them which are entirely consistent with the constitution and the laws. An office is a monopoly. Grants of land to settlers or soldiers, patents for discoveries or inventions, charters of corporate powers and privileges, are all lawful monopolies. A turnpike company monopolizes its tolls; a bank, its profits; a congregation, the offices of its church: and why might not the State monopolize the business of its railways and canals, if it desired to do so, by taking it into his own hands, or farming it out on terms to make it the more productive, by excluding competition? I speak not of the policy, but the legality of such a measure. Should it be injudiciously attempted, there would be no remedy for it but an appeal to the discretion of the Legislature.

But the respondents aver with great earnestness, and much apparent sincerity, that their purpose has been not to extinguish competition, but to promote it, by putting all the carriers in the trade, as near as may be, on a footing of equality. They have certainly created neither preference nor monopoly, as regards the public trucks; for these are open, on the same terms, to all the citizens, the relators included, who may desire to use them; and if the relators think proper to use their own, they are free to do so, but they have no further cause for complaint than that their own monopoly has suffered encroachment from a competition nourished by the public patronage. But it would be hard to convince the world that the relators are wronged, or that the public is prejudiced by it. It has brought down the price of freight and increased the amount of the revenue. The pretension of the relators to be put on a footing with the State, and that her agents shall not be suffered to underbid them for the public good, is a monstrous one. As individuals, destitute of a right to peculiar privileges, all they can demand, is to be put on a level with their neighbours; and are they not so when they can use the public trucks on the general terms? They are not bound to lay aside their own for those of the State; but that the State's officers are not at liberty to put the use of her trucks to her customers on her own terms, is a proposition that cannot be maintained. She is the

[Commonwealth v. The Canal Commissioners.]

mistress of her property, and may use it or hire it out as she pleases.

But the respondents deny that their regulations put those who use the public trucks on better ground than those who use their own. They admit that they do not charge their customers for motive-power; but they assert that this is necessary, not only to maintain the balance of competition, but to break up the monopoly of the trade formerly enjoyed by capitalists and companies. They allege, that before the necessity of transhipment at the Portage was obviated, the owner of but a few boats could not engage in the trade with a prospect of success, because the profits of a small business would not support the expense of the necessary agencies and commissions at Hollidaysburg and Johnstown. The difficulty has been surmounted by the introduction of the section-boat, which enables a carrier to engage in the business on equal terms with but a single craft; but the respondents say that they were at first without authority to provide the trucks necessary to transport the boats of those who had them not themselves, and that the relators refused to hire their trucks, or suffer them to be used for the transportation of any other boats than their own; by reason of which, they were still able to keep up the price of carriage despite of the respondents' efforts to lower it by reducing the tolls, which served no other purpose than to put just so much in the relators' pockets. They aver, too, that the exorbitance of the charges for transportation had driven a great part of the business to antagonist routes in the adjoining States in prejudice of the revenue, and the trade of our principal emporium: and all this, that a few capitalists and companies might suck the marrow out of the public works. I pretend not to determine the truth of these assertions; but that such abuses existed, is made more than probable by the conviction in Pittsburgh of certain conspirators bound by a written constitution and by oath to adhere to the prices fixed by the association; by the consequent decrease of the business on the lines; and by the enormous increase of it that has taken place since section-boats have come into general use. It had been perceived that the price of transportation could not be brought down by lowering the tolls without doing more; and that to put the principle of competition into effectual operation by introducing small capitalists into the business, it would be necessary to provide trucks to pass the sections of their boats across the Portage free of expense. The project was accordingly submitted to the Legislature, by whom it was coldly received; and though the commissioners were authorized to lay out $40,000 in purchasing trucks, no appropriation was made to enable them to do so, but they were directed to fix rates and charges for their use, and apply the proceeds to the cost of procuring them. They were thus compelled to lay a duty on them which, to effect the declared object of securing "a fair and free competition," it was necessary to compensate by a decrease

of tolls or the charge for motive-power, in order to enable the public trucks to compete with those already on the road. The respondents had, therefore, to choose between giving up a part of the tolls or the charge for motive-power; and they chose the latter, by which, they say, the public charges on transportation have been as nearly equalized among all classes of the carriers as they can be; and they allege that the increase of business consequent on the success of their measure, has exceeded their expectation. Certain it is, that the public works, since the introduction of the State trucks, have given strong indications of the profit which the Commonwealth is likely to derive from the introduction of this new system, and that the revenues, so far as past experience affords any evidence, will be greatly improved by it; and that this has been produced mainly by controlling and decreasing the charges for transportation, is not to be doubted; and this shows how necessary it is for the officers of the State to have a controlling influence over the prices of carriage, in order to bring our public lines of transportation into successful competition with the lines of our neighbours. There was a time when the produce of our western counties found its way to the New York market, even partly through our own canals to Lake Erie, despite of a reduction of the tolls on produce coming from places beyond Pittsburgh, merely because a few cents were saved by it on the bushel or the barrel. Thus the produce, not only of these counties, but of the valley of the Mississippi, was drawn from our main line; and by what? Evidently by the cupidity and extortion of the carriers, the paucity of whose numbers enabled them to make common cause. It is evident that a power to control them is necessary; and the section under consideration, therefore, ought not to be too strictly interpreted. But the most strict interpretation would leave power enough in the respondents to warrant what they have done. They had power to take the entire business of the line into their own hands; and they, who put their trucks on the road for their own accommodation, must at least allow the State to hire her trucks to others on her own terms.

The principle which rules the preceding part of the complaint, also rules the application to annul the contract of Cameron and Wilson to carry passengers over the Philadelphia and Columbia Railroad for reduced fare, and at a reduced rate of tolls. The State did no more, by becoming a party to it, than farm its right to carry; and in framing the bargain, it had a right to consult its exclusive interest; nor has it been asserted that its interest was forgotten. But the respondents' answer contains a denial of the relators' most material allegation, in point of fact, that they had directed their officers to attach all passenger cars, except those of Cameron and Wilson, to the burthen trains; and as the relators have not thought proper to take the matter before a jury, we are to treat the allegation as a chancellor would treat it, at a hearing

on bill and answer.　By Act of the 15th of April 1834, every citizen has a right to attach a car to a public engine; but no one pretends that the relators have not been allowed to do so.　What more do they want?　They surely cannot expect that their interest is to be made a subject of peculiar protection, to the prejudice of the State.　Even had the respondents, in fact, attached the relators' cars, as they are said to have done, they would not have exceeded their power; and if they discriminated, in respect to the rate of tolls, between passengers agreed to be carried for a reduced rate of fare, and those who were carried under no such an agreement, they were competent to do so, for the whole subject is left to their discretion by the Act of the 8th of April 1834; and they nay have exercised it very judiciously, in this instance, to attract custom to the road, by encouraging the owners of cars to carry their passengers on reasonable terms.　But even for an abuse of it, they would not be answerable to this court.　What we have to do with, is the legality of their acts; to judge of their propriety, is the province of another tribunal.

We are of opinion that the answer is sufficient, and that the motion for a peremptory *mandamus* be dismissed.